UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RACHEL NUFFER,                                    CASE NO. 20-10935

       *Plaintiff,*                                HON. THOMAS L. LUDINGTON
*v.*                                              DISTRICT JUDGE

AETNA LIFE INSURANCE                              HON. PATRICIA T. MORRIS
COMPANY,                                          MAGISTRATE JUDGE

       *Defendant.*
_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (ECF Nos. 20, 21.)

## I.    RECOMMENDATION

Plaintiff Rachel Nuffer brings this action for long-term disability benefits against Defendant Aetna Life Insurance Company[1] under the civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Both sides have moved for judgment on the administrative record. (ECF Nos. 20, 21.) The parties have fully briefed their motions and the case is now ready for Report and Recommendation, pursuant to E.D. Mich. L.R. 7.1(f)(1). Because the evidence fails to show Plaintiff was disabled under Aetna's plan, I recommend **DENYING** Plaintiff's motion for judgment on the administrative record (ECF No. 20) and **GRANTING** Defendant's motion. (ECF No. 21.)

---

[1] As Plaintiff referenced, Aetna was acquired by The Hartford Life Insurance Company. This explains why The Hartford is the indicated source of the portions of the administrative record (ECF 12). (*See* Pl. Br., ECF No. 20, PageID.1138 n.1.) Nevertheless, Aetna remains the entitled Defendant in this cause.

## II.   <u>REPORT</u>

### A.   **ERISA**

Concerned about the "growth in size, scope, and numbers of employee benefit plans," Congress passed ERISA in 1974 to ensure uniformity and stability in this rapidly changing field and to protect the interests of participants and beneficiaries of these plans. 29 U.S.C. § 1001; *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Among other things, ERISA regulates employee welfare benefit plans operated through insurance which provides payments in the event of disability. 29 U.S.C. § 1002(1); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir. 2009). Participants are employees or former employees who are or may become eligible to receive benefits under the plan. 29 U.S.C. § 1002(7). Beneficiaries, in turn, are persons "designated by a participant, or by the terms of an employee benefit plan, who [are] or may become entitled to a benefit thereunder." *Id.* § 1002(8).

At issue here is ERISA's civil enforcement provision allowing a plan beneficiary to bring an action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* § 1132(a)(1)(B). This "straightforward" provision lets beneficiaries bring suit for any benefits he believes have been wrongly withheld. *Davila*, 542 U.S. at 210. ERISA does not, however, establish whether a beneficiary is entitled to disability benefits—eligibility is determined by the plan. *Cleveland v. Liberty Life Assur. Co. of Boston*, No. 06-137080, 2009 WL 649893, at *2 (E.D. Mich. Mar. 10, 2009) (adopting Report & Recommendation). Nonetheless, claims for benefits must receive a "full and fair

review" and participants are entitled to "specific reasons" for denial. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010).

### B.    Factual Background

Plaintiff was hired at the Dow Corning Corporation in January 2008, and the last day she worked was November 27, 2016. (ECF No. 12-1, PageID.63–64; ECF No. 12-4, PageID.835.) Her occupation was Production Operator or Service Operator. (ECF No. 12-4, PageID.835, 847.) The essential functions of the job included completing inventory checks, participating in cycle counts, completing transactions, frequently interacting with site logistics, and completing deliveries and pickups. (*Id.* at PageID.847.) The job required the ability to drive large trucks, to interact with customers, to have knowledge of shipping documents, and to be proficient in computer skills. (*Id.* at PageID.848.) The job also required a commercial driver's license. (*Id.*) The job required frequent lifting of up to 50 pounds, and rare lifting of 51–100 pounds. (*Id.* at PageID.851.)

Aetna Life Insurance Company issued the applicable Group Insurance Policy (or "plan") to Dow Corning Corporation, and this plan provided for long-term disability coverage. (ECF No. 12-5, PageID.1048–49.) As a Dow Corning employee, Plaintiff was covered by the plan. (ECF No. 12-4, PageID.834–35.)

### 1.    The Plan

The plan sets out a tiered process for determining eligibility for long-term disability benefits, including an initial phase called the "Elimination Period" and an immediately succeeding 24-month period. (ECF No. 12-5, PageID.1052, 1053, 1081.) No benefits are

payable during the "Elimination Period," which begins on the day of disability and runs through one of two prescribed periods. (*Id.*) Throughout both the "Elimination Period" and the next 24 months[2], the claimant must meet the plan's Test of Disability. (*Id.* at PageID.1052, 1081.) The Test of Disability states:

> From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:
>
> - You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and
>
> - Your earnings are 80% or less of your adjusted predisability earnings.
>
> After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation[3] solely because of an illness, injury, or disabling pregnancy-related condition.

(ECF No. 12-5, PageID.1053) (emphasis omitted). The relevant difference between the two time periods, during the 24-month period and the post-24-month period, is that either a claimant cannot perform "*your* own occupation" or, later, "*any* reasonable occupation" under the Test of Disability. Next, "Benefits will be paid as soon as the necessary proof to support the claim is received. Written proof must be provided for all benefits." (*Id.* at PageID.1066.) A claimant "must furnish true and correct information as Aetna may reasonably request." (*Id.*)

---

[2] "Once you meet the [long-term disability] **test of disability**, your long term disability benefits will be payable after the Elimination Period, if any, is over." (ECF No. 12-5, PageID.1052.)

[3] A "reasonable occupation" is defined as "This is any gainful activity: for which you are, or may reasonably become, fitted by education, training, and experience; and which results in, or can be expected to result in an income of more than 80% of your adjusted predisability earnings." (*Id.* at PageID.1071) (quotation format condensed).

## 2.   Initial Medical Evidence

The record of Plaintiff's condition that preceded her disability determination is brief, but it is not controverted here, given the parties acceptance of her disability and respective compensation at the initial portion of the claim. While her subsequent condition is made an issue, as discussed more fully below, her initial condition is discussed here for its context.

In November 2016, Plaintiff complained of headache with extreme sensitivity to light and noise. (ECF No. 12-1, PageID.72.) Further, she experienced nausea and double blurred vision. (*Id.*) Plaintiff saw an optometrist, who advised that there was nothing wrong. (*Id.*) She saw a chiropractor, and the adjustments provided Plaintiff some relief for the headaches, but that relief was temporary. (*Id.*) She had prescriptions for Gabapentin, Synthroid, Percocet, Topamax, Imitrex. (*Id.* at PageID.73–74.)

Plaintiff reported left temporal region pain, persistent photophobia, nausea, and vision blurring. (*Id.* at PageID.80.) Plaintiff had hot/cold-feeling muscle spasms, tingling, numbness, stiffness, and generalized aches and pains. (*Id.*) She reported medications were tried, but they did not help. (*Id.*) An EEG did not show any neurologic abnormality. (*Id.*) MRI and CT scans of her head showed no acute abnormality or acute intracranial hemorrhage. (*Id.*; ECF No. 12-4, PageID.824–25, 827.)

Plaintiff described her daily activities. She cannot drive or keep up with cooking or housework. (ECF No. 12-1, PageID.73.) She had days where she cannot get out of bed because of headaches. (*Id.*) Her husband helped more with shopping or household work.

(*Id.*) Plaintiff went out about once a week. (*Id.*) She could shower, dress, and care for her personal hygiene. (*Id.*)

Plaintiff's doctor, Dr. Latonya Thomas had a diagnosis for Plaintiff of a concern of cervical disc radiculopathy, blurred and double vision, and non-intractable headache. (*Id.* at PageID.87; ECF No. 12-4, PageID.840–41.) Plaintiff's symptoms also included neck pain and complaints of paresthesias in the extremities. (ECF No. 12-1, PageID.87) She also reported constant tinnitus. (*Id.* at PageID.88.) Her medication caused drowsiness. (*Id.* at PageID.87.) Plaintiff reported generalized weakness and fatigue, however diagnostic studies of MRIs of the brain and cervical spine and an SSEP study of the lower extremities were normal. (*Id.*) She had an ER visit, where she was given and IV migraine cocktail and Norco. (*Id.* at PageID.88.) Plaintiff reported a flare of lower back problems and tenderness in her neck. (*Id.*) High dosages of steroids helped Plaintiff with her headaches, but the headaches returned when the medication was tapered. (*Id.*) Plaintiff was referred to the University of Michigan headache clinic, and she was prescribed sumatriptan and Topamax, but she said that did not help. (*Id.* at PageID.89.) Dr. Thomas indicated that Plaintiff had no ability to work and that Plaintiff was limited because of functional restrictions and prescribed medications. (ECF No. 12-4, PageID.841.) Dr. Thomas also indicated Plaintiff could never climb, crawl, or kneel, and Plaintiff could occasionally lift, pull, push, reach, carry, bend, and twist. (*Id.* at PageID.843.) Plaintiff could occasionally lift up to 10 pounds and never more than that amount. (*Id.*) Plaintiff should avoid exposure to noise, dust, fumes, and chemicals. (*Id.*)

Aetna recorded Plaintiff's chiropractic treatment notes from November 2016 to December 2016. (*Id.* at PageID.89.) Plaintiff reported constant headache, neck pain with stiffness, numbness and pins and needles, constant low back pain that radiated pins and needles, constant muscle pain, muscle spasms, light and sound sensitivity. (*Id.* at PageID.89.) Plaintiff's chiropractor indicated Plaintiff's complaints were persistent and worsening. (*Id.*)

### 3.   Application for Benefits, Initial Approval, and Further Medical Evaluation

Plaintiff's claim for disability benefits was acknowledged as received by Aetna on April 12, 2017. (ECF No. 12-4, PageID.854.) The claim was approved with the effective date of May 31, 2017. (ECF No. 12-1, PageID.59; ECF No. 12-4, PageID.872.)

Plaintiff was a new patient with the University of Michigan neurology clinic in February 2017. (ECF No. 12-4, PageID.720.) Plaintiff described constant headaches, double vision, ringing ears, photophobia and phonophobia. (*Id.*) Her examination showed normal muscle tone and bulk, 5/5 strength in all extremities, intact sensation, and normal reflexes. (*Id.* at PageID.722.) She had a narrow gait. (*Id.*) She was prescribed topiramate and Imitrex. (*Id.* at PageID.723.)

In April 2017, an EEG showed occasional left temporal region theta frequency slowing during awake and drowsy state, and there was no epileptiform activity. (ECF No. 12-4, PageID.818.) Further, in April 2017, Plaintiff was evaluated by Dr. Khan of Saginaw Valley Neurology. (*Id.* at PageID.709.) Dr. Khan described Plaintiff's condition, such as her headaches and vision complaints, and included that she wore dark glasses because of

her photophobia. (*Id.*) Dr. Khan noted Plaintiff had a "long list of symptoms which does not seem to have any organic basis." (*Id.*) Dr. Khan stated "She had several time imaging done and recent imaging was again unremarkable. Therefore from a neurologic standpoint there is not any specific disorder OR head/neck pain syndrome. . . . [S]he is discharged from further care from this clinic." (*Id.*)

Plaintiff's chiropractor, Dr. Paul Rodnick, provided a narrative for Plaintiff in April 2017. (*Id.* at PageID.733.) Dr. Rodnick saw Plaintiff since April 2011. (*Id.*) Plaintiff's complaints included headaches, ear ringing, light sensitivity, shaking, neck pain, back pain and hip pain, blurred vision, sound sensitivity, and balance issues. (*Id.*) Plaintiff had limited cervical and lumbosacral spine range of motion because of pain. (*Id.*) Dr. Rodnick believed Plaintiff's course of care would last at least another six months. (*Id.*) Plaintiff had a good prognosis, if she was able to follow her recommendations. (*Id.* at PageID.735.) On Dr. Rodnick's observation, Plaintiff was noted to have restricted spinal and pelvic regions, aberrant motions in the pelvic and sacrum regions, positive spasms in the pelvic and sacrum regions, and tender vertebrae. (*Id.* at PageID.738.)

In November 2017, Plaintiff continued to complain of headaches. (ECF No. 12-1, PageID.144; ECF No. 12-4; PageID.701.) Plaintiff also described her limited daily activities, including sleeping for most of the day, driving only to appointments, and limiting exposure to light and sound. (ECF No. 12-1, PageID.145.) Plaintiff also complained of stabbing pain, photo- and phonophobia, double vision and ringing in the ears. (ECF No. 12-4, PageID.701.) Plaintiff's previously prescribed medications were stopped due to side-effects. (*Id.*) Plaintiff's examination showed normal muscle bulk and tone, and 5/5 muscle

strength in all extremities. (*Id.* at PageID.702.) Plaintiff's sensation was intact, and she had normal reflexes. (*Id.*) Plaintiff was given a referral to Dr. Madala, a pain specialist. (*Id.* at PageID.703.)

Plaintiff received Botox injections. (ECF No. 12-1, PageID.182; ECF No. 12-2, PageID.364, 367.) She described her symptoms became less intense with the injections, and she was able to do six hours of daily activities rather than four hours. (ECF No. 12-1, PageID.182; *See*, *e.g.*, ECF No. 12-3, PageID.668 (recording some relief following a Botox injection).)

Plaintiff received treatment through Michigan Medicine neurology clinic. (ECF No. 12-2, PageID.335–61.) In November 2018, at a follow up on her migraines with Dr. Dunn, Plaintiff continued to report the daily occurrence of migraines, but the severity decreased with the Botox injections. (*Id.* at PageID.357.) It was noted that Plaintiff has a history of migraines, bariatric surgery, hypothyroidism, and obstructive sleep apnea. (*Id.*) Plaintiff reported that Dr. Cornblath evaluated her diplopia, and she was found to have convergence insufficiency. (*Id.*) Further, she reported ongoing blurred vision, photophobia, visual aura of white/yellow light, muscle spasm/pain, fatigue, and joint pain. (*Id.*) Examination showed Plaintiff had normal muscle bulk and tone, and 5/5 strength in all four extremities. (*Id.* at PageID.359.) Her sensation was intact. (*Id.*) She had normal reflexes. (*Id.*) She had a narrow-based gait. (*Id.*)

An interpretation of an EMG in December 2018 reported an essentially normal study. (*Id.* at PageID.353.) There was no electrodiagnostic evidence of lumbosacral or

cervical radiculopathy or inflammatory myopathy. (*Id.*) There was possible nerve or muscle issues with her foot. (*Id.*)

At a March 2019 follow-up, Plaintiff's history generally continued, relative to her headaches, Botox use, and muscle pain. (*Id.* at PageID.344.) Plaintiff also reported swelling of her knees, hips, and hands. (*Id.*) On examination, Plaintiff continued to have normal strength, sensation, and reflexes. (*Id.* at PageID.346.) Dr. Dunn discussed with Plaintiff the possibility of a fibromyalgia condition for Plaintiff. (*Id.* at PageID.347.)

In April 2019, Plaintiff reported a sudden onset of vertigo and unsteadiness. (*Id.* at PageID.338.) Plaintiff underwent a balance function evaluation. (*Id.*) The impression was that there were no objective indications of either peripheral or central vestibular system involvement. (*Id.*)

In June 2019, Plaintiff was recommended to be fitted with a hearing aid for her left ear. (*Id.* at PageID.335–36.)

### 4.     Social Security Administration's Approval of Plaintiff's Disability Claim

On December 19, 2017, Plaintiff's application for Social Security Disability Insurance benefits was approved, and this was based on the onset date of disability of November 25, 2016. (ECF No. 12-1, PageID.151; ECF No. 12-4, PageID.695.)

### 5.     Aetna's First Termination of Benefits

Aetna terminated Plaintiff's long-term disability benefits effective May 31, 2019. (ECF No. 12-5, PageID.1002–04.) Aetna's correspondence to Plaintiff noted a difficulty in obtaining updated medical records, and it concluded "[b]ased on the lack of current

medical documentation supporting restrictions and limitations precluding you from performing your own occupation or any occupation, we have determined you no longer meet the definition of disability . . . ." (*Id.* at PageID.1002.) Aetna's letter continued, claiming that Plaintiff did *not* attempt to complete an application for Social Security Disability Insurance benefits. (*Id.* at PageID.1003.) Subsequently, Aetna's records noted that the decision was overturned on appeal, as further discussed below, and given that medical records "were needed and not yet received at the time of termination." (ECF No. 12-2, PageID.245.) Aetna also noted that Plaintiff was, in fact, granted Social Security Disability benefits. (*Id.* at PageID.244.)

### 6.   Plaintiff's First Appeal and Additional Medical Evidence.

Plaintiff requested an appeal of her termination. (ECF No. 12-3, PageID.600.) Plaintiff's appeal request was acknowledged in a June 13, 2019 letter. (ECF No. 12-5, PageID.1008.) In her handwritten appeal, Plaintiff noted that Dr. Thomas provided the requested statements, that Aetna requested paperwork from the incorrect doctor, that she has received Social Security Disability benefits, that she was never asked for paperwork and to only provide release forms. (ECF No. 12-3, PageID.600–01.) Again, the decision of termination was overturned, and the claim was returned to Aetna's claim operations, based on additional medical records received. (ECF No. 12-5, PageID.1011.)

On May 31, 2019, Dr. Thomas completed an attending provider statement and worksheet on Plaintiff's capabilities and limitations. (ECF No. 12-3, PageID.602.) Plaintiff was capable of occasional kneeling, lifting, reaching, carrying, and bending; and she was never capable of climbing, crawling, pulling, pushing, and twisting. (*Id.*) Plaintiff was

occasionally capable of fine and gross manipulation as well as sitting, standing, and walking. (*Id.*) Plaintiff could never stoop or engage in repetitive motion. (*Id.*) Plaintiff could occasionally lift up to 20 pounds and never more than that amount. (*Id.*) Plaintiff needed to lie down for her headaches. (*Id.*) She had limited vision and sound sensitivity. (*Id.*) Plaintiff should limit her exposure to heat, cold, noise, and chemicals. (*Id.*) Dr. Thomas believed Plaintiff was not capable of working any hours of the day. (*Id.*) Dr. Thomas first saw Plaintiff for her migraines on December 1, 2016. (*Id.* at PageID.603.) Dr. Thomas described Plaintiff's symptoms as unpredictable, her medications have previously been ineffective, and Botox injections have continued. (*Id.*) She did not expect Plaintiff to be able to recover for gainful employment. (*Id.*)

Plaintiff was notified, via letter on June 17, 2019, that the decision to terminate benefits was overturned. (ECF No. 12-5, PageID.1012.)

### 7.    Aetna's Second Termination of Benefits

On July 2, 2019, an Employability Analysis Report on Plaintiff was completed. (ECF No. 12-2, PageID.415.) The report indicated Plaintiff's functional capabilities, based on a Clinical Consultant Review, that Plaintiff was capable of full-time sedentary work. (*Id.*) Plaintiff's work history was considered. (*Id.* at PageID.415–16.) Various changes were made for the analysis of her functional capabilities. This included limiting Plaintiff to sedentary work; recognizing her Associate's degree; limiting her to occasional crawling; keeping her abilities of climbing, balancing, stooping, and kneeling unchanged; changing noise to very loud because of no restrictions noted. (*Id.*) It was noted that Plaintiff could perform a variety of duties, work alone, work under stress, and follow specific instructions.

(*Id.*) The analysis reported there were 14 occupations that were "good" or "fair" as "viable employment matches" for Plaintiff, and it listed 11 occupations as a representative sample. (*Id.* at PageID.417.) These jobs paid at least $15.43 per hour, or $2,674.53 per month. (*Id.*) The conclusion, here, was that given Plaintiff's work history, education, and the direct transferability of her skills, she could perform these occupations within her skills, the reasonable wage, and the noted restrictions. (*Id.*) These occupations, it said, exist within reasonable numbers in the national economy. (*Id.*)

By a letter of July 3, 2019, Aetna informed Plaintiff of a termination of her benefits. (ECF No. 12-5, PageID.1015.) The letter included reference to her ability to perform certain jobs, based on a referenced transferable skills analysis, that had salaries that were equal to or greater than 60% of her adjusted predisability earnings. (*Id.*) Further, the letter indicated Aetna updated their record of Plaintiff's Social Security Disability Insurance claim and approval, but there was a stated significant difference between the current medical records and the medical records at the time of the Social Security application. (*Id.* at PageID.1016.) Thus, Aetna stated that little weight was given to Plaintiff's approved Social Security disability claim. (*Id.*)

### 8. Plaintiff's Second Appeal and Subsequent Medical Evidence

Plaintiff's second appeal was acknowledged via letter on July 8, 2019. (ECF No. 12-5, PageID.1019.)

In September 2019, following Plaintiff's second appeal, Dr. Mostafa Farache provided a review of Plaintiff's clinical files and provided conclusions. (ECF No. 12-2, PageID.322–32.) Dr. Farache reviewed Plaintiff's treatment for her migraines. (*Id.* at

13

PageID.330.) Plaintiff's complaints were described as consistent throughout. (*Id.*) She had a normal neurological examination. (*Id.*) While Plaintiff had complaints of blurry vision and diplopia, her examination was not remarkable; thus, this was not considered functionally impairing. (*Id.* at PageID.331.) Plaintiff's medication side effects were noted, but they were not considered functionally impairing. (*Id.*) Dr. Farache believed that Plaintiff could perform tasks on a predictable and sustainable daily 8-hour basis, with the accommodation of a 30-minute break if needed for administering headache medication. (*Id.*) With the normal neurological examination and other tests, and the lack of objective findings of a contrary condition for Plaintiff, Dr. Farache indicated that no additional restrictions or limitations were supported. (*Id.*) Subsequently, Dr. Farache had contact with Dr. Dunn. (*Id.* at PageID.323.) In the discussion with Dr. Dunn, Dr. Farache asked about Dunn's opinion of Plaintiff's impairment. (*Id.* at PageID.323–24.) Dr. Dunn was not sure that Plaintiff could perform work due to her headaches, but she said it was possible Plaintiff could perform work with accommodation. (*Id.* at PageID.324.) Following this, Dr. Farache again indicated no restrictions or limitations were supported, but the break time accommodation was supported. (*Id.*)

### 9. Final Termination

On October 1, 2019, Plaintiff was notified of the final termination of her benefits. (ECF No. 12-5, PageID.1042.)

### C.    Law and Analysis

#### 1.    Standard of Review

In the Sixth Circuit, courts do not strictly follow the Rule 56 summary judgment standard when reviewing an ERISA benefit determination. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Instead of rendering a threshold decision on whether material factual disputes exist, courts conducting *de novo* review are to examine the administrative record and make "findings of fact and conclusions of law accordingly," taking into consideration arguments about the "proper analysis of the evidentiary materials contained in the administrative record" but not admitting or considering any extraneous evidence. *Id.* Only if the plaintiff issues a procedural challenge to the administrator's decision, such as lack of due process or bias, can the court consider materials outside the record. *Id.* An accusation that the administrator had a conflict of interest, for example, could open the door to such evidence. *See, e.g.*, *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 n.2 (6th Cir. 2005) (noting that the parties could have explored the alleged conflict of interest through discovery).

ERISA does not provide an explicit standard for reviewing benefit eligibility challenges. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108–09 (1989). The default standard is therefore *de novo* review of the administrator's or fiduciary's decision, *id.* at 115; *Ross*, 558 F.3d at 608, applying to both the factual findings and legal conclusions. *Wilkins*, 150 F.3d at 613. Under this standard, the court does not give "deference to the decision" or presume its correctness, but instead asks whether it is correct. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). Put differently, the court

"'simply decides whether or not it agrees with the decision under review.'" *Miller v. Hartford Life Ins. Co.*, 348 F. Supp. 2d 815, 817 (E.D. Mich. 2004) (quoting *Anderson v. Great W. Life Assur.*, 777 F. Supp. 1374, 1376 (E.D. Mich. 1991)). Accordingly, courts have looked to see whether the preponderance of the record evidence supports disability. *James v. Liberty Life Assur. Co. of Boston*, 984 F. Supp. 2d 730, 736 (W.D. Mich. 2013) (*James I*) *aff'd by* 582 F. App'x 581 (6th Cir. 2014) (*James II*) (agreeing that preponderance of the evidence supported finding disability).

Where the plan gives the fiduciary or administrator discretion to determine eligibility, the arbitrary and capricious standard is used on review. *Bruch*, 489 U.S. at 103; *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). This standard applies when the policy expressly "grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). Nonetheless, the plan may give such authority without the use of any "'magic word,'" like "discretionary." *Renfro v. UNUM Life Ins. Co. of America*, 920 F. Supp. 831, 837 (E.D. Tenn. 1996) (quoting *Blcok v. Pitney Bowes Inc.*, 952 F.2d 1450, 1453 (D.C. Cir. 1992) (per RUTH BADER GINSBURG, J.)). If the decision is reviewed under this standard, the court will uphold it as long it resulted from "'a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Whitaker*, 404 F.3d at 949 (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

In Michigan, however, the regulatory body overseeing insurance policies, the Michigan Office of Financial and Insurance Services ("OFIS"), has prohibited policies

enacted or revised after July 1, 2007 that grant discretionary authority which would trigger the arbitrary and capricious review standard. Mich. Admin. Code R. 500.2201-02 (2015). *See also Ross*, 558 F.3d at 602-03; *Rice-Peterson v. UNUM Life Ins. Co. of America*, No. 11-14565, 2013 WL 1250457, at *7-8 (E.D. Mich. 2013). According to the regulations

> (b) On and after [July 1, 2007] . . . an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.
>
> (c) On and after [July 1, 2007] . . . a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code R. 500.2202(b)-(c). A discretionary clause "purports to bind the claimant to or grant deference in subsequent proceedings to the insurer's decision, denial, or interpretation" of the policy. *Id.* R. 500.2201(c). A clause meets this definition by, among other things, giving rise to a standard of review on appeal other than *de novo* review. *Id.* R. 500.2201(c)(vii). The Sixth Circuit has found that ERISA, which explicitly supersedes state laws on employee benefit plans, 29 U.S.C. § 1144(a), does not preempt these regulations. *Ross*, 558 F.3d at 609. As a result of these regulations, "any ERISA plans issued or amended after July 1, 2007 requires '*de novo* review of denials of ERISA benefits within Michigan.'" *Rice-Peterson*, 2013 WL 1250457, at *8 (quoting *Gray v. Mut. of Omaha Life Ins. Co.*, No. 11-15016, 2012 WL 2995469, at *3 (E.D. Mich. 2012)). This is true even if the plan contains discretionary language, since such provisions are void. *Id.*; *see also Keane v. Lincoln Nat'l Life Ins. Co.*, No. 1:11-CV-656, 2012 WL 4127827, at *5

17

(W.D. Mich. 2012) ("Although the Policy contains language granting Lincoln National discretionary authority to construe the Policy's terms and to determine eligibility, . . . the parties acknowledge that the proper standard of review in this case is *de novo*, in light of Michigan Administrative Code Rule 500.2202(b) . . . .").

In this case, the *de novo* standard applies. The effective date of the long-term disability plan was after July 1, 2007. (ECF No. 12-5, PageID.1048.) Further, it is not controverted that Plaintiff is a Michigan resident at all relevant times. Finally, the parties, by their arguments, accept the *de novo* standard as applicable. (Pl. Br., ECF No. 20, PageID.1153; Def. Br., ECF No. 26, PageID.1223.)

### 2.    Arguments and Analysis

### a.    Aetna's Application of its Test of Disability

Plaintiff claims that Defendant applied the wrong Test of Disability, under the definition of "any reasonable occupation". Specifically, following the initial stage of Plaintiff's long-term disability, Plaintiff claims that Defendant identified possible jobs for Plaintiff that provide income of at least 60% of Plaintiff's adjusted pre-disability earnings, and thus Defendant found that Plaintiff did not meet the plan's Test of Disability. Further, Plaintiff claims this is contrary to Defendant's long-term disability plan, which requires identified jobs to pay at least 80%, under the "any reasonable occupation" definition. Plaintiff is incorrect, insofar as the error here is harmless.

Here, the parties do not dispute the following:

- Plaintiff's pre-disability annual salary in 2018 was $53,476.80[4], or $4,456.40 per month. (Pl. Br., ECF No. 20, PageID.1155 citing ECF No. 12-1, PageID.173.)

- Plaintiff's pre-disability annual salary in 2019 would be $55,691.18, or $4,640.93 per month. (Def. Resp., ECF No. 26, PageID.1248 citing ECF No. 12-1, PageID.199.) The record appears to suggest that amount.[5]

- Plaintiff's 80%-adjusted salary in 2019, the higher amount of the two years, was $3,712.75 per month. (ECF No. 12-1, PageID.199.)

Plaintiff claims that the positions identified by Defendant fail to meet the 2018 80%-adjusted monthly salary of $3,565.12. (Pl. Br., ECF No. 20, PageID.1155.) Curiously, Plaintiff cites to the same document (ECF No. 12-2, PageID.260; or ALIC00221) that shows two jobs, maintenance scheduler and repair-order clerk, that shows monthly wages of $4,085.47 each. Defendant also identifies the fact of the existence of these two jobs, but without citing the same document. (Def. Br., ECF No. 26, PageID.1248.) Clearly, the income of these two jobs are within the relevant definition of "any reasonable occupation" at the 80%-adjusted income level; further, Plaintiff does not raise any argument here that she does not have the education, training or experience to do the work of maintenance

---

[4] *See also* ECF No. 12-4, PageID.846.

[5] There appears to be a typographical error in the Defendant's employment record for Plaintiff in the administrative record. In this instance, the 2019 record for Plaintiff shows a "Pre-Disability Annual Salary" of $53,476.80. Further down the record, it shows Plaintiff's adjusted yearly salary under "80[%]" as $44,552.94. That is mathematically incorrect, as 80% of $53,476.80 is $42,552.94. Further, the Pre-Disability Annual Salary is the same in 2018 and 2019, but the records present different amounts for the 80%-adjusted salary. (ECF No. 12-1, PageID.173, 199.)

Defendant partially recognizes the result of the above calculation in its brief's argument, noting that the 2019 80%-adjusted salary was $3,712.75 per month, and that monthly amount is higher than the adjusted 2018 monthly salary. (ECF No. 26, PageID.1248 citing ECF No. 12-1, PageID.199. *See also* ECF No. 12-1, PageID.173.)

Regardless of the discrepancy, by giving Plaintiff the benefit of the doubt and following the higher threshold of the 80% adjusted salary of $3,712.75 per month, there remains identified occupations for Plaintiff, as discussed further in the Report and Recommendation.

scheduler and repair-order clerk. Nor does Plaintiff raise an argument about the sufficiency of two jobs and their respective available positions in the economy.

Plaintiff's claim that Defendant never applied the correct disability standard is not persuasive. While, on its face, Defendant applied the lower—and incorrect—60%-adjusted income threshold, Defendant nevertheless found two jobs of Plaintiff's education, training, and experience that meet the required 80%-adjusted income. Plaintiff's claim here appears to focus on the July 3, 2019 termination letter to Plaintiff (ECF No. 12-5, PageID.1015), where it identified four jobs at the incorrect 60% level, and that this was never subsequently fixed via correspondence with Plaintiff. Regardless, Plaintiff would have been denied benefits, based on this income issue, if the correct information in ECF No 12-2, PageID.260 were properly reported to Plaintiff. *Judge v. Metropolitan Life Ins. Co.*, 710 F.3d 651 (6th Cir. 2013) is relevant here, as cited by both parties, for the proposition of a permissible remedy following an initial incorrect application of a disability standard. Contrary to Plaintiff's view, the fact that Defendant apparently did not subsequently correct the above-described error in their paperwork that was communicated to Plaintiff is not supportive of Plaintiff's argument here. Defendant, from the existing administrative record, has shown the existence of two jobs within the income definition of "any reasonable occupation". Remand to correct this harmless error would not change the result of this case, as to this issue[6].

---

[6] *See Judge*, 710 F.3d at 660–61. ("Finally, as a practical matter, even if MetLife were found to have applied an incorrect definition of total and permanent disability, a remand to MetLife for reconsideration under the correct definition would be unavailing. . . . We thus find no jurisprudential purpose in remanding to MetLife for reconsideration when it would undoubtedly reach the same conclusion based on the administrative record before it.")

> **b.**      **Aetna's Use of Objective Evidence of a Subjective Condition**

Plaintiff claims that neither Dr. Farache nor Ms. Babineau considered the consistency and intensity of Plaintiff's headaches, which she alleges is contrary to the findings of her treatment providers. Overall, Plaintiff asserts that her headaches' intensity can be subjectively proven.

Plaintiff's argument places the proverbial cart before the horse. The issue in the first instance is not the claimed consistency or intensity of the headaches. The first issue is whether there is medically acceptable objective evidence of an impairment that can cause pain. After that, there is consideration of the extent of subjective pain. This is full position, rather than just the cited subjective portion, of Plaintiff's citation to *Boyd v. Liberty Life Assur. Co.*, 362 F.Supp.2d 660, 668 (W.D.N.C. 2005). Plaintiff fails to cite that Dr. Farache considered Plaintiff's migraine diagnosis, her continued headaches despite medication, her lack of ER visits, and her normal neurologic and EMG exams. (ECF No. 12-2, PageID.327–31.) Further, Dr. Farache discussed Plaintiff's condition with Dr. Dunn, and Dr. Dunn indicated that Plaintiff had a good prognosis as well as the possibility of working with accommodation when she has severe headaches. (*Id.* at PageID.323–24.)

Plaintiff's reference to Ms. Babineau in this argument is unclear, as the cited record only appears to provide her assessment of Dr. Thomas' attending provider statement. (ECF No. 12-2, PageID.248 citing ECF No. 12-3, PageID.602.)

In matters such as this case, "The real dispute centers on whether the evidence suffices to show [plaintiff] met the Policy's disability standard, not whether the evidence

came in properly objective forms." *Seals v. Liberty Life Assur. Co. of Boston*, 2015 WL 13741598, at *14 (E.D. Mich. 2015), *rep. and rec. adopted*, 1:14-cv-13423-TLL-PTM, ECF No. 23 (E.D. Mich. 2016). Here the long-term disability plan required Plaintiff to give proof of the nature and extent of her loss, to provide true and correct information, and to authorize Aetna to investigate the claim. (ECF No. 12-5, PageID.1066.) Further, the plan defined "illness" as "A pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to the findings set the condition apart as an abnormal entity differing from other normal . . . body states." (*Id.* at PageID.1069.) Here, in this argument, Plaintiff points to no objective evidence of her condition. Plaintiff fails to prove her migraines preclude her from working, without objective evidence. *See Brown v. Hartford Life & Acc. Ins. Co.*, 2018 WL 3972195, at *2 (E.D. Mich. 2018).

Corresponding to Plaintiff's argument here, Defendant argues that Plaintiff failed to satisfy the "any reasonable occupation" Test of Disability. Defendant is correct.

Again, and relevant to Plaintiff, the Test of Disability looks to an injury that prevents her from performing any reasonable occupation. Under the long-term disability plan, Plaintiff must provide evidence that is peculiar of clinical signs, symptoms, and laboratory findings. Subjective complaints, alone, are not sufficient. *See Seals*, at *14.

Plaintiff had an unremarkable neurologic exam with Dr. Dunn. (ECF No. 12-2, PageID.346.) Dr. Dunn also reported Plaintiff's reduced severity of migraines with Botox. (*Id.* at PageID.360; *see also* ECF No. 12-3, PageID.668.) Plaintiff had an unremarkable brain MRI. (ECF No. 12-2, PageID.360–61.) No doctor, other than Dr. Thomas, opined that Plaintiff was not capable of work. (ECF No. 12-3, PageID.602–03.) Dr. Dunn believed

22

it was possible that Plaintiff could work with accommodation for breaks. (ECF No. 12-2, PageID.324.) Dr. Thomas' opinion is not supported by any record and it is not consistent with any other medical record. This opinion garners little weight. *Keskeny v. United of Omaha Life Ins. Co.*, 2017 WL 1405019, at *3 (E.D. Mich. 2017) (rejecting treating physician's "conclusory findings unsubstantiated by objective record evidence").

In addition to the matter of objective evidence, Plaintiff's activities also do not suggest disability. Plaintiff declined testing for her sleep issues, and she declined certain migraine medication due to possible weight gain adverse to her history of gastric bypass. (ECF No. 12-2, PageID.357, 360; ECF No. 12-4, PageID.701.) Also, after her disability in 2016, Plaintiff reported continuing to participate in her Bikers Against Child Abuse activities, and she would volunteer as a secretary and do courtroom visits. (ECF No. 12-3, PageID.606; ECF No. 12-4, PageID.805.)

Earlier, and noted here, Plaintiff cites to *Hamid v. Metropolitan Life Ins. Co.*, 2021 WL 405225 (N.D. Cal. 2021) for the proposition that subjective symptoms can rise to the level of disability. However, *Hamid* is distinguishable. *Hamid*'s definition of disabled differs from the instant case significantly. Hamid had to show he could not earn 80% or 60% of his earnings in the relevant periods, and to show that "due to sickness . . . [he was] receiving Appropriate Care and Treatment and complying with the requirements of such treatment." *Hamid*, at *2. *Hamid* is silent as to objective evidence of a condition, unlike Aetna's plan with its illness definition and the evidence requirements for a disability claimant. Further, unlike *Hamid*, Plaintiff does not have the doctors, co-workers, and

23

family members corroborating her reports of pain, nor does she have doctors who have suggested more aggressive or surgical intervention. *Cf. Hamid* at *11.

In consideration of the whole record, Plaintiff has not supported that her headaches are a disabling condition.

### c.      Aetna's Full and Fair Review of Evidence

Plaintiff argues that Aetna did not give a full and fair review of Plaintiff's case. Plaintiff cites four instances of evidence that she claims that Aetna failed to address. Plaintiff errs here because these instances are underdeveloped to properly make a claim.

As indicated above, in *Seals* and the long-term disability plan, it is Plaintiff's burden to provide evidence of her disability.

First, Plaintiff asserts that her convergence insufficiency was not addressed by any medical professional, and Plaintiff cites her claimed error of Dr. Farache's review. (Pl. Br., ECF No. 20, PageID.1153, 1157; citing ECF No. 12-2, PageID.328.) Contrary to what Plaintiff asserts, Dr. Farache noted that Dr. Dunn noted Plaintiff's diagnosis of convergence insufficiency. (*See* ECF No. 12-2, PageID.357.) There, in Plaintiff's history, it states the finding of convergence insufficiency, and, further, that Plaintiff's vision and reading ability had improved with Botox. Plaintiff provides no evidence of the extent, intensity, or consistency of headaches related to convergence insufficiency. Plaintiff cannot claim that Aetna failed to address evidence when Plaintiff did not provide the relevant evidence, either in her underlying claim or her argument here.

Second, Plaintiff asserts Aetna did not address her spinal conditions. Plaintiff offers no evidence that substantiates this assertion. From the record, Dr. Thomas' statement

indicated "a concern of cervical disc radiculopathy" in March 2017. (ECF No. 12-4, PageID.840–41.) This condition did not carry over to Dr. Thomas' May 2019 statement. (ECF No. 12-3, PageID.603.) Further, Plaintiff does not cite to any other evidence that is supportive of cervical radiculopathy or any condition related to it. While Plaintiff cites to chiropractor records, Plaintiff assumes without providing evidence that the documented muscle spasm, pain, or limited range of motion are related to radiculopathy. Further, the chiropractor evidence ends in 2017. (ECF No. 12-4, PageID.733.) Plaintiff does not explain the significance of 2017 evidence, given the more recent 2019 evidence showing adequate neck movement (ECF No. 12-2, PageID.336), the EMG study that showed no electrodiagnostic evidence of cervical radiculopathy (*Id.* at PageID.346), or the absence of discussion of problems associated with a spinal condition (*Id.* at PageID.344).

Third, Plaintiff fails to support with any significance, legal or otherwise, any claim based on document production issues with the Social Security Administration. Plaintiff already pursued one appeal on her termination, and the decision was overturned. (*Id.* at PageID.242.) Plaintiff has already received benefit from this claim when her case was reopened. She does not explain what, if anything, she is due post-reopening by this argument. Further, given the timeframe of the Social Security decision, Plaintiff does not articulate the relevance of that decision or the evidence that underlies it, to the decision here which is based on more recent evidence. *See*, *e.g.*, *Barnes v. Hartford Life & Acc. Ins. Co.*, 2008 WL 4298466, at *10 (E.D. Mich. 2008) (acknowledging a contrary disability conclusion from Social Security, when defendant recognizes the award of benefits and when Social Security did not have the benefit of more recent evidence).

Fourth, Plaintiff reiterates here, without further development, her argument regarding an alleged erroneous vocational review because of an error in the Test of Disability. This argument is not different than Plaintiff's first argument, above, which was disposed of unfavorably for Plaintiff. Accordingly, the analysis and result would not change.

### d.   Aetna Correctly Determined Plaintiff Failed to Satisfy the Test of Disability.

Defendant argues that it correctly determined that Plaintiff failed to satisfy the "any reasonable occupation" Test of Disability. Defendant relies on issues raised above and also posits the reports of Drs. Farache and Dunn, of Plaintiff's generally normal neurological testing, of her improvement with Botox treatments, of her infrequent/lack of emergency medical intervention. As to the review by Dr. Farache, "[u]nder ERISA, it is reasonable for an administrator to rely on the expert opinions of consulting physicians who review the medical data." *White v. Standard Ins. Co.*, 895 F. Supp. 2d 817, 846 (E.D. Mich. 2012). Further, the occupational data relative to 60% or 80% of Plaintiff's income was addressed above as harmless error. Finally, based on the above evidence and the general lack of contrary objective evidence, I suggest that the denial of Plaintiff's long-term disability benefits was adequately supported by the record evidence.

### D.   Conclusion

For these reasons discussed above, I suggest that Aetna made the correct decision to deny Plaintiff long-term disability benefits. Consequently, I recommend **DENYING** Plaintiff's motion (ECF No. 20) and **GRANTING** Defendant's motion (ECF No. 21).

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 26, 2021                          S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge